IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Buffalo & Pittsburgh Railroad, Inc.,   :
                    Petitioner   :
                            :
         v.                  :
                            :
Pennsylvania Public Utility      :
Commission,                :   No. 489 C.D. 2023
              Respondent   :   Argued: December 4, 2023


BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                     FILED: March 1, 2024

      Buffalo & Pittsburgh Railroad, Inc. (BPRR) petitions this Court for review of the Pennsylvania Public Utility Commission's (Commission) April 20, 2023 opinion and order (Opinion and Order) requiring BPRR to remove three railroad bridge structures in Knox Township (Township), Jefferson County (County), Pennsylvania. BPRR presents four issues for this Court's review: (1) whether substantial evidence supported the Commission's decision; (2) whether the Commission arbitrarily and capriciously disregarded competent testimony and relevant evidence; (3) whether the Commission improperly relied upon the Pennsylvania Department of Transportation's (PennDOT) Design Manual Part 2, Highway Design (PennDOT Publication 13M) (Design Manual) despite competent testimony from BPRR's professional traffic engineer that the Design Manual does not apply to existing structures; and (4) whether the Commission improperly applied its holding in *Mahoning Township v. Buffalo & Pittsburgh Railroad*, *Inc.*,

Commission Docket No. C-2017-2585787, filed Aug. 2, 2018 (*Putneyville Crossing*). After review, this Court affirms.

BPRR operated a railroad line through the Township and maintained the attendant rights-of-way thereto. Ramsaytown Road (T-841), East Bellport Road (T-405), and Harriger Hollow Road (T-420) crossed BPRR's rights-of-way (collectively, the Crossings). The Ramsaytown Road and East Bellport Road Crossings consist of concrete arch structures over which the railroad tracks ran. The Harriger Hollow Road Crossing had been the location of a steel girder single-span bridge structure with concrete abutments. BPRR abandoned the railroad line in 2005 or 2006 and salvaged the track at the Crossings. BPRR also removed the steel superstructure at the Harriger Hollow Road Crossing.

On April 10, 2019, after receiving complaints from Township residents of falling concrete, and in light of concerns regarding dangers from the concrete abutments' presence where the roadways narrow at the Crossings and run between the concrete abutments, the Township filed a Complaint with the Commission seeking the removal of the Crossings.[1]

---

[1] Section 2702(c) of the Public Utility Code provides:

> Upon its own motion or upon complaint, the [C]ommission shall have exclusive power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such crossing heretofore or hereafter constructed to be relocated or altered, or to be suspended or **abolished upon such reasonable terms and conditions as shall be prescribed by the [C]ommission**. In determining the plans and specifications for any such crossing, the [C]ommission may lay out, establish, and open such new highways as, in its opinion, may be necessary to connect such crossing with any existing highway, or make such crossing more available to public use; and may abandon or vacate such highways or portions of highways as, in the opinion of the [C]ommission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any of such crossings.

2

On June 14, 2019, the Commission's Rail Safety Division (Division) convened a field conference at the Crossings sites, which the Division's Senior Civil Engineer Manager, William M. Sinick, P.E. (Sinick), and representatives of the Township, the County, Brookville Borough, BPRR, and PennDOT attended. During the field conference, the parties discussed the Crossings' conditions. For public safety reasons, the parties agreed to mitigation measures for each Crossing site.

On September 10, 2019, the Commission served a Secretarial Letter (September 2019 Secretarial Letter) on the parties that memorialized the parties' observations, identified safety issues, and directed the parties to perform interim remedial safety work at the Crossings. *See* Reproduced Record (R.R.) at 27a-32a. Pursuant to the September 2019 Secretarial Letter, the Township was required to (1) furnish and install advance warning signs for the vertical clearance restrictions at each Crossing; (2) furnish low clearance overhead signs which BPRR would install on each structure; (3) furnish and install advanced warning signs and an advisory speed placard for the horizontal clearance restriction at the Ramsaytown Road Crossing; (4) furnish and install roadway clearance markers at the edge of the abutments and arch end walls at each Crossing; and (5) establish and maintain any detours or traffic controls that may be required during BPRR's work. BPRR was required to (1) install the low clearance overhead signs the Township provided; and, (2) remove all loose and delaminated concrete and debris from the inside and outside of the concrete arch supports at Ramsaytown Road and East Bellport Road, and remove all material that had fallen into or adjacent to the roadways.

---

The [C]ommission may order the work of construction, relocation, alteration, protection, suspension[,] or abolition of any crossing aforesaid to be performed in whole or in part by any public utility or municipal corporation concerned or by the Commonwealth or an established nonprofit organization with a recreational or conservation purpose.

66 Pa.C.S. § 2702(c) (emphasis added).

By letters dated December 13, 2019, and February 10, 2020, BPRR informed the Commission that it had completed the work described in the September 2019 Secretarial Letter. On February 21, 2020, the parties held another field conference. Following unsuccessful settlement negotiations, the Division requested that the Commission refer the Complaint to the Office of Administrative Law Judge (ALJ) for hearing.

On January 25, 2022, ALJ Mary D. Long (ALJ Long) held a telephonic evidentiary hearing during which expert structural engineer Wayne Duffett, P.E. (Duffett),[2] expert traffic engineer Charles Wooster (Wooster), and Chad Boutet (Boutet)[3] testified for BPRR. In addition, Township Supervisor James M. Berry (Berry) testified on the Township's behalf, and Sinick testified for the Commission's Bureau of Investigation and Enforcement (I&E). PennDOT witness Charles P. Keilman, IV, P.E., also testified.[4]

On June 24, 2022, ALJ Long issued a Recommended Decision (Recommended Decision), wherein she proposed that the Commission grant the Township's Complaint and order BPRR to demolish the three Crossings "at its sole cost and expense." R.R. at 870a. BPRR filed Exceptions to the Recommended Decision and I&E filed a reply to the Exceptions.

---

[2] Duffett is a licensed professional engineer concentrating in structures and transportation. He has been in practice since 1988 and has been devoted almost exclusively to railroad bridges. BPRR has been his client for approximately 32 years. *See* R.R. at 99a.

[3] Boutet is Director of Engineering Grants for the Northern Region Railroads of Genesee & Wyoming, Inc., including BPRR.

[4] Counsel for the County appeared, but he did not offer any exhibits or call any witnesses to testify, and no one appeared on Brookville Borough's behalf.

On April 20, 2023, the Commission issued its Opinion and Order denying BPRR's Exceptions and adopting ALJ Long's Recommended Decision. Specifically, the Commission ordered:

> 5. That the [Crossings] cross, below grade, the right[-]of[-]way of [BPRR], in [the Township], shall be altered in accordance with the work ordered herein.
>
> 6. That [BPRR], at its sole cost and expense, within nine (9) months of the date of service of the Commission's [Opinion and] Order, shall furnish all material and perform all work necessary to alter the [Crossings] by: (1) demolishing and removing the existing railroad structures, which includes the reinforced concrete arch structures, reinforced concrete abutments, and/or bridge structure material, in their entirety from the public crossing locations and surrounding areas; (2) backfilling and grading the area thus disturbed; (3) providing 28-feet minimum of graded roadway and shoulder area between the embankments at Ramsaytown Road (T-841) before sloping the embankments behind the removed structures to a safe 2:1 grade; (4) providing a 24-feet minimum of graded roadway and shoulder area between the embankments at Harriger Hollow Road (T-420) and East Bellport Road (T-405) before sloping the embankments behind the removed structures to a safe 2:1 grade; and (5) grading and seeding the area thus disturbed on the embankments and surrounding areas to prevent soil erosion, all in safe and satisfactory condition.

Opinion and Order at 40. BPRR appealed to this Court.[5, 6]

---

[5] "This Court's review is limited to determining whether the Commission violated constitutional rights, committed an error of law, rendered a decision that is not supported by substantial evidence, or violated its rules of practice." *Romeo v. Pa. Pub. Util. Comm'n*, 154 A.3d 422, 427 (Pa. Cmwlth. 2017).

[6] On July 11, 2023, BPRR filed a motion for stay in the Commission, which the Commission denied on October 19, 2023. On October 31, 2023, BPRR filed an expedited application for stay in this Court. On November 16, 2023, following argument on the application, this Court granted the application for stay.

Initially,

> Section 2702 of the Public Utility Code[, 66 Pa.C.S. §
> 2702,] vests the Commission with exclusive power to
> allocate costs and determine the manner in which a
> highway-rail crossing may be constructed, altered,
> relocated, *suspended*[,] or abolished. (Emphasis added.)
> *See E*[.] *Rockhill T*[*wp.*] *v. P*[*a.*] *Pub*[.] *Util*[.] *Comm*[*'n*],
> . . . 540 A.2d 600, 603 ([Pa. Cmwlth.] 1988). **The
> Commission is not limited to any fixed rule**, **but may
> take into consideration all relevant factors**, **with the
> only requirement being that the order is just and
> reasonable**. *Borough of S*[.] *Greensburg v. P*[*a.*] *Pub*[.]
> *Util*[.] *Comm*[*'n*], . . . 544 A.2d 82 ([Pa. Cmwlth.] 1988);
> *Dep*[*'t*] *of Transp*[.] *v. P*[*a.*] *Pub*[.] *Util*[.] *Comm*[*'n*], . . .
> 469 A.2d 1149 ([Pa. Cmwlth.] 1983).

*Mun. of Monroeville v. Pa. Pub. Util. Comm'n*, 600 A.2d 655, 656-57 (Pa. Cmwlth.

1991) (bold emphasis added; footnote omitted).[7]


1. **Substantial Evidence**

BPRR first asserts that substantial evidence does not support the

Commission's factual findings. Specifically, BPRR argues:

> The record below demonstrates a lack of substantial
> evidence that the railroad bridges at issue are unsafe for
> the motoring public. The only bridge inspections and
> traffic engineering inspection were performed by BPRR
> and its experts, and revealed that the bridges are
> structurally safe, have only superficial deterioration that
> can be, and has been, addressed by routine maintenance,
> and that all of the bridges safely and efficiently
> accommodate their traffic volumes. No competing
> opinions or expert testimony based on engineering

---

[7] In *Monroeville*, this Court affirmed the Commission's order directing that a bridge carrying a single-lane road over railroad tracks be closed indefinitely. The *Monroeville* Court found that the Commission's order was just and reasonable because the Commission balanced the benefit and harm to the traveling public and took into consideration the effect on traffic congestion, the road's condition and its need for repair, and the requisite public safety concerns.

> inspections were submitted by either [the] Township or I&E.

BPRR Br. at 19-20. BPRR maintains that Berry's and Sinick's testimony was biased and lacked credibility and, thus, is insufficient to constitute substantial evidence.

> This Court has observed:

> In *Energy Pipeline Co*[.] *v. Pennsylvania Public Utility Commission*, . . . 662 A.2d 641 ([Pa.] 1995), our Supreme Court explained that[,] pursuant to Section 335(a) of the [Public Utility] Code:

>> [I]f exceptions are filed, then the matter is taken to the [Commission], where "the [Commission] has all the powers which it would have had in making the initial decision . . . ." 66 Pa.C.S. § 335(a). The [Commission] has the power to conduct its own fact finding, to adopt or reject the ALJ's decision, or to come to an entirely different resolution. Thus, if exceptions are filed, only the [Commission] can take action, and the ALJ's decision cannot take on the force and effect of an order.

> *Energy Pipeline Co.*, 662 A.2d at 644. Thus, under Section 335 of the [Public Utility] Code, once exceptions are filed or once the Commission takes a decision for review *sua sponte* pursuant to [Section 5.536 of the Commission's Regulations,] 52 Pa. Code § 5.536, the Commission may review the ALJ's decision in its entirety without limit. Thus, the Commission may confine its review to issues raised in exceptions or may review issues not raised in exceptions.

*Romeo v. Pa. Pub. Util. Comm'n*, 154 A.3d 422, 429 (Pa. Cmwlth. 2017) (footnote omitted).

> Further,

> [w]hen reviewing an agency's findings of fact, this Court will defer to those factual findings if they are supported by substantial evidence. The Commission is the ultimate fact[-]finder. *See . . . P[a.] Power Co*[.] v. *P[a.] Pub*[.] *Util*[.] *Comm*[*'n*], . . . 625 A.2d 719, 726 ([Pa. Cmwlth.]

7

1993) (holding that "an ALJ's decision may always be overruled based upon contrary findings by the [Commission] if the [Commission's] findings are based on substantial evidence"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Peak v. Unemployment Comp*[.] *B*[*d.*] *of Rev*[.], . . . 501 A.2d 1383, 1387 ([Pa.] 1985). "[I]n a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the fact[-]finder, rather, the pertinent inquiry is whether there is any evidence which supports the fact[-]finder's factual finding." *Mulberry M*[*kt.*]*, Inc. v. City of Phila*[.]*, B*[*d.*] *of License* [*&*] *Inspection Rev*[.], 735 A.2d 761, 767 (Pa. Cmwlth. 1999).

*Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 22 A.3d 353, 359 (Pa. Cmwlth. 2011) (citation omitted).

Here, Berry testified that in his capacity as Township Supervisor, he had received complaints that concrete had fallen from the Crossings' bridges. *See* R.R. at 173a-174a. In addition, Berry explained that the Ramsaytown Road underpass prevents him and other local farmers from moving farm equipment along the roadway because the farm equipment is too wide to fit through the narrow underpass. *See* R.R. at 185a-186a. BPRR asserts that Berry's testimony regarding workers removing fallen concrete is limited to the Ramsaytown Road Crossing and does not reflect his personal observations, since he was not present at the time the concrete was removed from the roadway.

Sinick, "a civil engineer [with] a professional engineering license" and a "certified bridge inspector in the State of Pennsylvania" who has "been dealing with bridges and structures for the whole course of [his] professional engineering career[,]" R.R. at 242a, described the Crossings as of October 21, 2021. With respect to the Ramsaytown Road Crossing, Sinick stated:

> The railroad bridge structure along **Ramsaytown Road (T-841)** is a concrete arch structure. This type of bridge

8

structure is known as a concrete closed spandrel arch. Its bridge elements consist of an arch barrel, spandrel walls, abutments, and wings. The arch barrel is the portion of the bridge that you would drive through. The arch barrel length in the direction of the roadway is approximately 100 feet. The spandrel walls are located above the arch barrel oriented in the direction of the railroad grade and are directly above the roadway. They retain the earthen material above the arch barrel to the top of the railroad grade. The railroad tracks, ties, and ballast normally would be located on top of the earthen material but have been removed.

The abutments are the portion of the bridge located on each side of the roadway that the arch barrel ties into and then extends down to the footing below the ground. The wings flare out from the abutments and retain the earthen embankment that makes up the entire railroad grade prior to the bridge. The condition of the concrete of the arch barrel and spandrel walls show heavy deterioration, delamination, cracking, and spalls. *See* [R.R. at 663a-664a, 666a, 669a, 673a, 675a]. <u>This delaminated concrete is most certainly falling on the roadway. Concrete from the structure was visibly noticed along the roadway within and outside of the arch barrel and spandrel walls</u>. *See* [R.R. at 662a, 668a, 672a]. <u>Concrete inside the barrel along the roadway was clearly delaminated and ready to fall off. The delaminated condition was easily determined by sounding the concrete</u>. In layman's terms, to sound the concrete you tap on the concrete and if you hear a hollow sound the concrete in that area is in a delaminated condition. <u>The concrete in the arch barrel is largely in a delaminated condition along the roadway</u>. This condition of the concrete is indicative of the structural breakdown in the chemical composition of the concrete itself due to its age, lack of maintenance, and its exposure to water and salt spray.

The approaching roadway to the structure is a two-laned paved roadway with an average width of approximately 16 feet with 3-to-5[-]foot gravel shoulders on each side of the roadway. This shoulder area is part of the roadway clear zone. The traversable roadway width within the barrel of the arch is limited, approximately 12 feet. *See* [R.R. at 670a]. The minimum vertical clearance is 14 feet, 1 inch

9

measured from the top of roadway to the minimum distance of the arch barrel above the traversable roadway. The total structure height above the roadway to the top of the spandrel wall above the vertical clearance sign is approximately 20 feet. The earthen material above the top of the spandrel wall is heavily vegetated and presents a public safety issue of its own. Debris, logs, trees, rocks, and people could fall off the edges of the spandrel walls onto the roadway as there is no preventive measures in place to restrict this from happening. *See* [R.R. at 666a, 670a, 678a-680a].

R.R. at 602a-604a (underline emphasis added; citation omitted).

Sinick described the East Bellport Road Crossing as follows:

The railroad bridge structure along **East Bellport Road (T-405)** is a concrete arch structure similar in design to the Ramsaytown Road bridge structure. It is in better condition than the Ramsaytown Road structure, but it also has cracks, delamination, and spalls throughout the concrete structure. *See* [R.R. at 626a-632a, 635a]. The earthen material above the arch barrel and within the spandrel walls [is] heavily wooded and vegetated which presents its own public safety issues, as previously stated. *See* [R.R. at 633a, 641a-643a]. The approaching roadway to the East Bellport [Road] structure is a two-laned gravel roadway with an average width of approximately 15 feet with 3-to-5-foot shoulders on each side of the roadway. This shoulder area is part of the roadway clear zone. The traversable roadway width within the barrel of the arch is approximately 13 feet. *See* [R.R. at 636a]. The minimum vertical clearance is 12 feet-8 inches measured from the top of [the] roadway to the minimum distance of the arch barrel above the traversable roadway. The total structure height above the roadway to the top of the spandrel wall above the vertical clearance sign is approximately 20 feet.

R.R. at 604a-605a (underline emphasis added).

Regarding the Harriger Hollow Road Crossing, Sinick recounted:

The railroad bridge structure along **Harriger Hollow Road (T-420)** is a steel girder simple span bridge structure. The clear span between edge of concrete abutment to edge of concrete abutment is 17 feet. As

10

stated earlier, the steel superstructure has been removed and placed adjacent to one of the abutments. *See* [R.R. at 650a]. The concrete condition of the abutments is fair, there are cracks and spalls on both abutments. *See* [R.R. at 646a, 656a-658a, 660a]. The abutments appear to be stable and not in danger of rotating, settling, or overturning. However, the concrete abutments are in the roadway clear zone and restrict sight distance and are a detriment to public safety. There was noticeable scarring on the abutments due to vehicle contact. The steel superstructure is within the Commission's jurisdiction and is a hazard on the railroad grade for [all-terrain vehicles], snowmobiles, children, etc.

The approaching roadway to the Harriger Hollow Road structure is a two-laned gravel roadway with an average width of approximately 15 feet with 3-to-5-foot shoulders on each side of the roadway. This shoulder area along the roadway is part of the roadway clear zone. The traversable roadway width between the abandoned abutments is approximately 14 feet. The height of the abutments above the roadway is approximately 14-15 feet. The length of the abutments/wingwalls in the direction of the roadway is approximately 51 feet. There is steel fencing affixed to both abutments[;] as I stated previously this fencing was added without a Commission application. *See* [R.R at 646a, 650a, 655a].

R.R. at 605a-606a (underline emphasis added; citation omitted). Sinick acknowledged that he does not have experience in traffic engineering.

With respect to the deteriorating concrete, BPRR's witness, Duffett, testified:

All three [Crossings/]bridges [were] constructed at approximately the same time, about 100 years ago. **All three bridges are constructed of mass concrete**. **And by that**, **I mean generally un-reenforced concrete**, but significant size, significant cross section. That's typical of bridge construction of that era. **Each of the three bridges exhibits typical surface deterioration of the concrete that is typical of 100**[-]**year**[-]**old concrete**. That is the condition we generally call spalling, which **the outer surface of the concrete at an inch or two deteriorates**

11

> **from exposure to freeze**[,] **thaw or salt from roadways**.
> **And these bridges exhibit that condition**. It's very
> typical of structures of this vintage.

R.R. at 101a (emphasis added). Nonetheless, Duffett added that "[t]he concrete in these structures flakes off in very small pieces. If you were to examine what's accumulated along the roadway, it's like dust. And having no evidence that any person has ever been struck by a piece of concrete[] here, I can't say that it's a hazard here." R.R. at 113a-114a.

> In reaching its decision, the Commission observed:

> The two structures at Ramsaytown and East Bellport Roads are arch structures. ALJ Long considered the testimony of the [p]arties and concluded that the structures presented a hazard to the public and should, therefore, be abolished.

> **Of significance to this conclusion was the visual evidence of the deteriorating condition of the concrete at the [C]rossings[,] in addition to the testimonial evidence of the observance of falling/spalling concrete**.

> **ALJ Long** noted and **acknowledged**, as did all the [p]arties, that the expert witness testimony of BPRR witness, [] Duffett, that **the condition of the bridges was sound, was not disputed**. Therefore, based on this testimony, **there was no finding of immediate or imminent hazard of structural failure**, *i.e.*, of collapse regarding the [C]rossings. Notwithstanding, ALJ Long found that such testimony regarding **the overall structural integrity of the structures was not dispositive of the issue of safety to the traveling public** in [the] Township. The pertinent reasoning of [] ALJ [Long] was, as follows:

> > **The testimony of** [] **Berry and** [] **Sinick describing the concrete falling from inside** the arch barrels of Ramsaytown Road and East Bellport Road [**is**] **more credible than the testimony of** [] **Duffett**. [] **Duffett was overly dismissive of the risk of falling concrete damaging vehicles or harming pedestrians and**

12

**is contradicted by the photographic evidence which clearly shows cobbles of concrete along the roadway which are much larger than** "flakes" or "dust." **Moreover**, **photographs also show sections of concrete which are missing from the walls and ceiling of the arch barrels**. Although [] Duffett claimed he had inspected the [C]rossings at some point in the 1990s, [] Duffett did not have a progression of inspection reports which would support his position that these sections came from the walls gradually over time as "dust" or "flakes."

BPRR has neglected these [C]rossings for many years. **There is no evidence that any of the structures had been inspected before 2019**, **shortly after [the] Township filed its [C]omplaint**. There is no evidence of any inspection done when rail service was abandoned sometime in 2005 or 2006. Although [] Duffett testified that he recalls inspecting the [C]rossings in the 1990s, he did not have copies of any reports.[8] Further, **it is not credible that**, **given the thousands of bridge inspections that [] Duffett performs**, **he would have a reliable memory of two crossings in a rural area of Pennsylvania**.

[R.R. at 859a (footnotes omitted)].

Opinion and Order at 23-24 (bold and underline emphasis added; citations and footnote omitted).

The Commission reasoned:

On review of the record, **we disagree with what we observe as the trivialization of the hazard to the travelling public from conditions of the concrete at each of the structures and presence of the remaining abutments**. We shall, therefore, deny the Exceptions of BPRR. **Review of the visual evidence in this proceeding is compelling in support of the preponderance of the**

_____

[8] Notably, BPRR provided no evidence that, prior to the Township filing the Complaint, it had ever inspected the Crossings following its abandonment thereof. *See* R.R. at 859a.

**evidence in support of the Complaint** and the overall recommendations of . . . ALJ [Long]. We shall, therefore, adopt the recommendations of [] ALJ [Long]. In pertinent part, the following reasoning supports our determination:

> [] [T]here is also no dispute that two cars cannot pass safely through any of the [C]rossings. As explained above, the abutments themselves, as immovable objects in the roadway clear zone, pose a crash risk regardless of their placement in relation to the roadway. The Commission reached a similar conclusion in its disposition of the *Putneyville Crossing* [d]ecision, relying in part on I&E's recommendation that the railroad should remove the abutments because they are located in the roadway clear zone.
>
> BPRR points out that [] Sinick conceded that if there [was] rail traffic on the line, he would not take the position that the abutments should be removed. **It is important to keep in mind that the risk posed by the abutments as a vehicle hazard is not offset by any public benefit**.[9] Indeed[,] the Commission is not limited to any fixed formula in evaluating any crossing that safety can be broadly construed and considers many relevant factors.

[R.R. at 864a (footnotes omitted)].

Opinion and Order at 36-37 (emphasis added).

With respect to Sinick's testimony, BPRR contends that Sinick did not perform bridge inspections during his visits and the only such inspections were performed by its expert, Duffett, who opined that the bridges were structurally sound and that any deficiencies were merely superficial. It emphasizes that, under such circumstances, the Commission should have given more weight to Duffett's

---

[9] "The benefit a party receives from a crossing is a relevant factor in assigning maintenance responsibilities[.]" *Bell Atl.-Pa., Inc. v. Pa. Pub. Util. Comm'n*, 672 A.2d 352, 355 (Pa. Cmwlth. 1995).

testimony. Notwithstanding, the Commission, as it was empowered to do, determined that Duffett's testimony regarding the superficial deterioration was not credible given that he unreasonably discounted the risk of falling concrete.

The Commission's analysis reveals that the Commission did **not** base its decision on any perceived deficiencies in the bridges' *structural* integrity as might be revealed in a formal inspection. Instead, the Commission focused on the danger to the public from falling concrete at the Ramsaytown Road and East Bellport Road Crossings resulting from the purportedly superficial deterioration and the lack of public benefit, given BPRR's abandonment of the Crossings. Thus, the Commission's focus was not on the bridges' structure, but on the danger that the deterioration presented to the public. The lack of a formal bridge inspection by Sinick does not undermine the value of his observations of the readily-visible deteriorating concrete conditions. This deterioration was also evidenced by photographs showing interior sections of missing concrete and concrete debris, *see* R.R. at 626a-632a, 635a, 662a-664a, 669a, 672a-675a, by Berry's testimony regarding concrete remains on the roadway and nearby grass, and by Sinick's testimony regarding the potential for additional deterioration and resulting falling concrete.[10]

With respect to the dangers caused by the concrete abutments' presence resulting in the roadways' narrowing, and the sight restrictions, the Commission considered that the immovable concrete abutments constituted hazards, and that

---

[10] The Dissent's repeated references to "loose and flaking concrete," ignores the photographic and testimonial evidence demonstrating the "heavy deterioration, delamination, cracking, and spalls" Sinick observed. R.R. at 603a. *See Buffalo & Pittsburgh R.R., Inc. v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth. No. 489 C.D. 2023, filed Mar. 1, 2024) (Leavitt, S.J., dissenting), slip op. at 4.

15

there was no public benefit justifying the continued presence of such hazards since BPRR abandoned the rail lines along the subject bridges.

In *Pennsylvania Game Commission v. Pennsylvania Public Utility Commission*, 651 A.2d 596 (Pa. Cmwlth. 1994), this Court found that evidence of similar conditions constituted substantial evidence justifying a Commission order directing removal of several train crossing structures. There, a railroad petitioned the Commission to abolish 11 railroad crossing structures on property owned by a private landowner and the Pennsylvania Game Commission (Game Commission). Following hearings before an ALJ, the Commission entered an opinion and order addressing the crossings' condition. The private landowner petitioned this Court for review of the Commission's order as it related to crossings 7, 8, and 9.[11]

In addressing the private landowner's appeal, the *Game Commission* Court emphasized the Commission's power to promote public safety under Section 2702 of the Public Utility Code and its authority to consider all relevant factors in that regard, reasoning:

> [A] review of the [Commission's] order and the evidence upon which its decision was based, particularly as set forth by the ALJ, demonstrates that the [Commission] balanced the relevant factors. As for [c]rossing [n]o. 7, the ALJ found that **the structure should be removed because the pedestals adjacent to the roadway were a danger to vehicles using the roadway**. The structure at [c]rossing [n]o. 8 was ordered removed by the [Commission], based on evidence that an at-grade crossing would provide safer access for the Game Commission's heavy trucks using the railroad right-of-way. The ALJ's findings concerning [c]rossing [n]o. 9 **indicated that the road curvature caused poor sight distances at the crossing** and that people could fall off the bridge because no guardrails were in place on the bridge. **These findings**, **based on substantial evidence in the record**, **provided for a just**

---

[11] The Game Commission also petitioned this Court for review of the Commission's order as it related to crossing numbers 1, 6, 7, 8, 9, 10, and 11.

16

**and reasonable order**, **which demonstrated the [Commission's] concern and consideration for public safety needs**.

*Game Comm'n*, 651 A.2d at 603 (emphasis added).

Here, the Commission found that the former public benefits from BPRR's then-active rail lines no longer exist, given BPRR's abandonment of the rail lines and, thus, they no longer offset the inherent dangers from the Crossings' concrete deterioration, sight restrictions, and the abutments' presence in the roadways' clear zones. As in *Game Commission*, substantial record evidence supports the Commission's conclusions and accordingly, this Court discerns no error.[12]

## 2. Capricious Disregard

BPRR next contends that the Commission capriciously disregarded competent evidence. Specifically, BPRR asserts:

> The [Commission's] Opinion and Order focused on three separate and distinct conditions or issues with the bridges. A review of the entire record shows that the [Commission's] findings with respect to these conditions were not supported by substantial evidence, and that competent relevant evidence submitted by BPRR was capriciously disregarded, including unrebutted expert testimony.

BPRR Br. at 20.

This Court has explained:

---

[12] "While this Court may have weighed the evidence differently than the [Commission] . . . this Court is not a super [Commission] with the authority to reweigh the evidence in favor of [BPRR]." *Dep't of Transp. v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth. No. 1773 C.D. 2010, filed May 13, 2011), slip op. at 16. Unreported decisions of this Court, while not binding, may be cited for their persuasive value. Section 414(a) of the Internal Operating Procedures of the Commonwealth Court, 210 Pa. Code § 69.414(a). *Department of Transportation* is cited for its persuasive value.

> "A capricious disregard of evidence occurs when there is a 'willful, deliberate disbelief of an apparently trustworthy witness[] whose testimony one has no basis to challenge.'" *Cerasaro v. Workers' Comp[.] Appeal B[d.] (Pocono Mountain Med[.], Ltd.)*, 717 A.2d 1111, 1113 (Pa. Cmwlth. 1998) (quoting *Gallo v. Workmen's Comp[.] Appeal B[d.] (United Parcel Serv[.])*, . . . 504 A.2d 985, 988 n.2 ([Pa. Cmwlth.] 1986)). However, there is no capricious disregard of record evidence merely because the Commission reaches a different conclusion than that argued by the proponent of the evidence. Where the Commission is presented with a choice of actions, each fully developed in the record, its decision is an implicit acceptance of one and a rejection of the other.

*Metro. Edison*, 22 A.3d at 359-60 (citations omitted).

The Commission's rejection of Duffett's testimony that cracking and deteriorating concrete on the Crossings would not fall and cause injury was not "willful, deliberate disbelief of an apparently trustworthy witness[] whose testimony one has no basis to challenge." *Id*. at 359-60 (quoting *Cerasaro*, 717 A.2d at 1113). Rather, the Commission considered the witnesses' testimony and the photographic evidence and simply "reache[d] a different conclusion than that argued by [BPRR]." *Metro. Edison*, 22 A.3d at 359-60. Therefore, the Commission did not capriciously disregard evidence.

Moreover, despite Wooster's testimony regarding the low traffic volume at the subject crossings, the lack of reported accidents, and his inspections of the abutments for vehicle impacts, the Commission believed that the abutments' presence was an unnecessary risk even absent such accidents. In *Pennsylvania Railroad Co[.] v. Pennsylvania Public Utility Commission*, 195 A.2d 162 (Pa. Super. 1963), the Pennsylvania Superior Court affirmed a Commission decision requiring a railroad to build a pedestrian crossing over its tracks. The Superior Court held that "[a]lthough there is no substantial evidence of the occurrence of any serious accidents at this crossing, we do not believe that fact limits the power of the

18

Commission to correct a condition which it believes may lead to the injury or death of persons subjected to such condition." *Id*. at 164. Thus, the Commission was free to credit Wooster's testimony and still conclude that the abutments posed an unsafe condition requiring remediation. Accordingly, the Commission did not capriciously disregard Wooster's testimony.

### 3. **Design Manual**

BPRR next argues that the Commission improperly relied on PennDOT's Design Manual to conclude that the abutments are dangerous despite expert testimony that the Design Manual does not apply to existing structures.

Importantly, the Commission relied on Berry's and Sinick's testimony and on the photographic evidence regarding the alleged hazards caused by the abutments. The Commission relied on the Design Manual in concluding that the abutments caused unnecessary roadway hazards. Sinick stated:

> The main purpose of the Commission's involvement after an abandonment and discontinuance of railroad service through the [Surface Transportation Board] is to assess the public safety of the highway/rail crossings and to make improvements to the roadways and/or railroad facilities to improve the safety of the highway/rail crossing[s] for pedestrians and the motoring public. Secondly, the Commission's involvement is necessary to abolish the public crossing and dissolve the Commission's jurisdiction at that location since the public utility is no longer in service at that location. In short, the final disposition of the Crossings, including abolishment, needs to be addressed to ensure the current and future safety of the [C]rossings in light of the railroad's decision to abandon and/or discontinue service at the [C]rossing[s]. In this case, the safest practical option for public safety and the motoring public is the outright removal of the concrete fixed objects within the roadway clear zone.
>
> [The] Design Manual . . . is very clear on this and is an important tool on reestablishing the roadway geometry,

the roadway clear zone, and addressing public safety within the Commission's jurisdiction at these public [C]rossings. While there may not be a pending roadway improvement or project proposed by [the] Township or any other party at this time, the pending litigation before the Commission is to address the public safety issues posed by the presence of the railroad structures, and thus can be viewed as a roadway or crossing improvement project if the Commission orders the outright removal of the railroad [C]rossing structures or other remedial measure to address public safety. This proceeding is essentially a proposed and/or requested roadway improvement project.

R.R. at 615a-616a.

The Commission similarly relied on the Design Manual in its *Putneyville Crossing* decision, wherein the Commission adopted the ALJ's recommended decision that stated:

PennDOT's [Design Manual] sets forth [PennDOT's] policy for highway design criteria. PennDOT's [Design] Manual designates abutments at underpasses as fixed objects in the roadway clear zone and therefore hazardous to the traveling public. PennDOT's traffic engineer, David P. Tomaswick, explained[:] "The term, "clear zone" is used to designate the unobstructed traversable area provided beyond the edge of the traveled way for the recovery of errant vehicles." [*Putneyville Crossing*] Tr. [at] 153 . . . . "A fixed object would be something that when it's struck by a vehicle, it's not going to move. A utility pole, a tree, bridge piers, abutments." [*Putneyville Crossing*] Tr. [at] 153. Thus, PennDOT concedes that the safest option for the Putneyville Crossing in its current condition is removal of the remaining abutments.

*Putneyville Crossing*, June 12, 2018 Recommended Decision at 21 (citations omitted).

"[T]he Commission is not limited to any fixed formula when determining whether to abolish a rail crossing, but may take into consideration all relevant factors, with the only requirement being that the order is just and

20

reasonable[.]" *N. Lebanon Twp. v. Pub. Util. Comm'n*, 962 A.2d 1237, 1247 (Pa. Cmwlth. 2008). BPRR's contention that the Design Manual does not apply to existing structures does not diminish the common-sense observation noted therein that fixed structures within a roadway's confines are hazardous to vehicles traveling on the roadway - whether the roadway is newly proposed, or already existing. The Design Manual is a PennDOT manual and is not binding on the Commission. Thus, even if the Design Manual applies only to new projects or new construction when used by PennDOT, the Commission may consider the information therein. Although the Design Manual was not made a part of the record, Wooster testified as to its meaning and Sinick referenced the Design Manual in his testimony.[13] Accordingly, the Commission's consideration of conditions described in the Design Manual as hazardous was relevant evidence and was not error.[14]

---

[13] Sinick explained:

> [PennDOT] is the authority for Pennsylvania public highways and public safety along public highways. Though the Commission supersedes [PennDOT] and has exclusive jurisdiction within a public crossing, to recommend less than mandated or prescribed by [PennDOT's] specifications, policies, and procedures would be problematic and could negatively impact public safety.

R.R. at 608a.

[14] The Dissent observes: "The uncontroverted testimony of . . . Wooster, established that the Design Manual does not require the modification of existing roadways and bridges, even those that may be substandard. The ALJ acknowledged that [the] Design Manual serves as a guide only for new roadway construction or improvement projects." *Buffalo & Pittsburgh R.R.* (Leavitt, S.J. dissenting), slip op. at 3 (citations omitted). Although the Design Manual purportedly applies to new road construction, the Commission is not **bound** by the Design Manual, and although the Design Manual may inform new construction, the dangers identified therein are not limited to new construction. A dangerous condition is a dangerous condition regardless of whether the road is newly constructed or existing. I&E's witness Sinick referenced the clear zone hazards identified in the Design Manual. Such was not improper even though the Design Manual was not in evidence given that Sinick relied on the Design Manual in formulating his opinion and the opposing witness also testified regarding the Design Manual.

21

**4.** *Putneyville Crossing*

Finally, BPRR contends that the Commission erred by relying on *Putneyville Crossing* in deciding the instant matter. According to BPRR, *Putneyville Crossing* is factually distinguishable, and the Commission improperly applied the holding for the proposition that the absence of any accidents at the subject Crossings does not establish that the Crossings are safe.

The Commission noted in its Opinion and Order:

ALJ Long expressly referenced and was influenced by considerations addressed by the Commission in the September 2019 Secretarial Letter, which expressly included findings, and made reference to, conclusions and deliberations of the *Putneyville Crossing* [d]ecision. *See* [R.R. at 862a-863a]:

The history of other crossings abandoned along the railway at issue here was addressed by the Commission in the *Putneyville Crossing* [d]ecision and referenced in the September [] 2019 Secretarial Letter. As explained below, I conclude that there is no compelling reason to treat the [] Township [C]rossings differently than the Putneyville Crossing or the PennDOT crossings described in that decision.

---

The Pennsylvania Superior Court has stated:

It is well[]established that an expert may express an opinion which is based on material not in evidence, including other expert opinion [sic], where such material is of a type customarily relied on by experts in his or her profession. *Collins v. Cooper*, 746 A.2d 615, 618 (Pa. Super. 2000); *Primavera v. Celotex Corp.*, . . . 608 A.2d 515 ([Pa. Super.] 1992). . . .

*Boucher v. Pa. Hosp.*, 831 A.2d 623, 628 (Pa. Super. 2003)[].
*In re Condemnation of Parcel ID No. 02-033-004 v. Lands of Tarlini*, 185 A.3d 1177, 1184 (Pa. Cmwlth. 2018).

The September [] 2019 Secretarial Letter noted that PennDOT had "removed three (3) of the overhead railroad structures along their roadways in conjunction with a larger federal/state funded roadway project . . . ." In the *Putneyville Crossing* [d]ecision, the Commission explained that PennDOT had removed overhead railroad structures, including the concrete abutments[,] "to enhance the safety for motorists by providing improved visibility and less restrictive clearances through the former crossings." The Commission found this factor was persuasive in concluding that the Putneyville Crossing, including the abutments, was not safe for the motoring public.

[R.R. at 862a-863a (footnotes omitted)].

Opinion and Order at 22.

In the Recommended Decision, ALJ Long further explained:

The Commission [in *Putneyville Crossing*] also relied, in part, on the "clear zone" concept described in the PennDOT Design Manual. The Commission concluded that the abutments at the Putneyville Crossing "are designated as hazardous structures in the roadway clear zone."

Finally, the Commission held the lack of accidents is not dispositive of the determination of whether a crossing is safe and observed:

[t]he Superior Court's holding in *Pennsylvania Railroad* . . . , is dispositive of [BPRR's] argument. . . . In affirming the Commission's decision, the Superior Court held, "[a]lthough there is no substantial evidence of the occurrence of any serious accidents at this crossing, we do not believe that fact limits the power of the Commission to correct a condition which it believes may lead to the injury or death of persons subjected to such condition." [*Pa. R.R.*,] . . . 195 A.2d at 164. Considering the holding in *Pennsylvania Railroad*, the absence of any accidents at the Putneyville Crossing does not establish that the crossing is safe. Therefore,

23

[BPRR's] argument, that is, the Putneyville Crossing is safe because of a lack of accidents at the site, is without merit.

Like the Commission in the *Putneyville Crossing* [d]ecision, I also conclude that the evidence weighs in favor of the conclusion that the three railway [C]rossings in [the] Township are unsafe in their present condition. First, the potential for falling concrete from the arch barrels of Ramsaytown Road and East Bellport Road poses a hazard to both the motoring public and to pedestrians who may be struck by falling cobbles or larger pieces of concrete as the barrel arches continue to deteriorate. After decades of neglect, I find BPRR's promise to inspect the [C]rossings annually is not sufficient to alleviate this risk.

Second, the sight distance at the Harriger Hollow [C]rossing clearly poses a hazard. Although [] Wooster cites the curvature of the road as a cause, he also concedes that the existence of the abutments also plays a role in the narrow sight distance.

Third, there is also no dispute that two cars cannot pass safely through any of the [C]rossings. As explained above, the abutments themselves, as immovable objects in the roadway clear zone, pose a crash risk regardless of their placement in relation to the roadway. The Commission reached a similar conclusion in its disposition of the *Putneyville Crossing* [d]ecision [sic], relying in part on I&E's recommendation that the railroad should remove the abutments because they are located in the roadway clear zone.

R.R. at 863a-864 (footnotes omitted).

BPRR contends that *Putneyville Crossing* is inapposite because there was significantly greater traffic volume at the subject roadway. BPRR further emphasizes that *Putneyville Crossing* involved a state highway, while the roads at issue in the instant matter are Township roads. BPRR asserts that, although the Commission in *Putneyville Crossing* improperly applied PennDOT's Design

24

Manual to an existing structure, at least the road was a state highway subject to PennDOT's Design Manual.

In the instant matter, the Commission was free to weigh the evidence and to conclude that the subject Crossings were unsafe given the bridges' conditions and the abutments' locations despite that the roads were less traveled. A hazard in a roadway does not necessarily become less so because fewer cars travel the road. Thus, traffic volume was not a sufficient reason to render *Putneyville Crossing* inapposite.

Although the roads at issue here are Township roads, the Crossings are nonetheless regulated by the Commission. The Commission "may take into consideration all relevant factors, with the only requirement being that the order is just and reasonable[.]" *N. Lebanon Twp.*, 962 A.2d at 1247. As stated above, it was not error for the Commission to consider PennDOT information regarding vehicle safety even if the material relates to state highways rather than Township roads. Further, regardless of whether the Design Manual only applies to a new structure, nothing prohibits the Commission from considering the concept of clear zones as described therein when evaluating the safety of crossings under its jurisdiction.

Finally, BPRR contends:

> The ALJ who presided over [*Putneyville Crossing*] interpreted *Pennsylvania Railroad* [] to mean that a lack of accidents does not prove that a crossing is safe. This is inherently inconsistent with the Superior Court's holding, which simply provided that the Commission can still regulate a facility even if there is no evidence of accidents.

BPRR Br. at 35.

BPRR's characterization of the Superior Court's ruling in *Pennsylvania Railroad* is erroneous. The Superior Court in *Pennsylvania Railroad* was clear: "**Although there is no substantial evidence of the occurrence of any serious**

25

**accidents at this crossing**, **we do not believe that fact limits the power of the Commission <u>to correct</u> a condition which it believes may lead to the injury or death of persons subjected to such condition**." *Pa. R.R.*, 195 A.2d at 164 (bold and underline emphasis added).  This Court declines BPRR's invitation to interpret the Superior Court's holding as simply permitting the Commission to regulate a facility absent evidence of accidents.[15]  The *Pennsylvania Railroad* Court did not merely refer to Commission authority to regulate but, rather, the Commission's power to "**correct**" a hazardous condition, even where there is no record evidence of any serious accidents.  *Id*. (emphasis added).  Thus, the lack of prior accidents does not prevent the Commission from concluding that a condition is hazardous and directing that the hazardous condition be abated.  Accordingly, the Commission did not err by relying upon *Putneyville Crossing*.[16]

For all of the above reasons, the Commission's Opinion and Order is affirmed.  The November 16, 2023 stay this Court ordered shall continue for 120

---

[15] *See Monongahela Connecting R.R. Co. v. Pa. Pub. Util. Comm'n*, 211 A.2d 113 (Pa. Super. 1965) (wherein the Pennsylvania Superior Court rejected a similar argument, stating:

> The appellant makes much of the fact of the prior good safety record of this operation and that there is no evidence of prior accidents resulting in wrecks or personal injury during the many years of operation.  However, if we were to decide these problems only on that basis in the face of evidence of a probably dangerous situation that could be corrected with air brakes and the next month personal injury or death result from an accident caused by inefficient braking on the hot bridge, there would indeed be a red-faced court.[).]

*Id*. at 116.

[16] The Dissent maintains that the Commission should not have evaluated the safety of the Crossings constructed many years ago.  To the contrary, the Commission must decide whether the Crossings pose a safety risk **now**, not whether they did so 100 years ago.  Given changes to transportation over the last 100 years, a manual that describes dangers to modern drivers from objects in a road's clear zone is relevant to the Crossings that continue to be used today whose abutments are in the clear zone.

26

days from the date of the Order herein so BPRR may complete the work directed in the Commission's Opinion and Order.[17]

 

_____
ANNE E. COVEY, Judge

---

[17] The Dissent contends that "[w]hile there was evidence of loose and delaminated concrete, there was **no evidence that this superficial deterioration could be solved only by demolition**." *Buffalo & Pittsburgh R.R.* (Leavitt, S.J. dissenting), slip op. at 1 (emphasis added). However, nothing in the Commission's statutory authority requires that removal or demolition be ordered only as a last resort. *See* Section 2702(c) of the Public Utility Code (which provides in relevant part that the Commission "may abandon or vacate such highways or portions of highways as, in the opinion of the [C]ommission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any of such crossings." 66 Pa.C.S. § 2702(c)).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Buffalo & Pittsburgh Railroad, Inc.,   :
                   Petitioner   :
                           :
           v.                    :
                           :
Pennsylvania Public Utility          :
Commission,                    :    No. 489 C.D. 2023
                  Respondent   :

## O R D E R

AND NOW, this 1st day of March, 2024, the Pennsylvania Public Utility Commission's (Commission) April 20, 2023 opinion and order (Opinion and Order) is affirmed.  The November 16, 2023 stay this Court ordered shall continue for 120 days from the date of this Order so that Buffalo & Pittsburgh Railroad, Inc. may complete the work directed in the Commission's Opinion and Order.

_____

ANNE E. COVEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Buffalo & Pittsburgh             :
Railroad, Inc.,                   :
                Petitioner    :
                        :
         v.                 :    No. 489 C.D. 2023
                        :    Argued: December 4, 2023
Pennsylvania Public Utility     :
Commission,                 :
               Respondent : 

BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY SENIOR JUDGE LEAVITT             FILED: March 1, 2024

      The majority affirms the Pennsylvania Public Utility Commission's (PUC) adjudication in favor of Knox Township (Township) on its complaint that Buffalo & Pittsburgh Railroad, Inc. (Railroad) be ordered to demolish three railroad bridges that pass over township roads.[1] The PUC ordered their demolition even though the evidence established that they were structurally sound and in no danger of collapse. Administrative Law Judge (ALJ) Proposed Adjudication at 24. While there was evidence of loose and delaminated concrete, there was no evidence that this superficial deterioration could be solved only by demolition; nor did the PUC so find. With respect, I dissent.

---

[1] The PUC's order contains 24 directives on the full contours of the demolition project, effectively placing the PUC in the role of construction supervisor. For example, the order requires not just demolition of the bridge structures but directs the dimensions, slopes, grading and seeding of the "surrounding areas." PUC Order, ¶6. It directs that "all work necessary to complete the removal of the railroad structures and grading at the subject crossing shall be done in a manner satisfactory to the [PUC.]" *Id.*, ¶15.

By way of background, the railroad bridges that cross Ramsaytown, East Bellport, and Harriger Hollow Roads were constructed more than 100 years ago. ALJ Proposed Adjudication, Finding of Fact (F.F.) No. 10. Two of the railroad bridges are supported by concrete arches, or tunnels, that take these roads through the embankment where the railroad tracks were positioned before their removal. Each road is approximately 12 feet wide as it passes through the underpass. *Id*., F.F. Nos. 29, 35. All that is remaining of the Harriger Hollow Road overpass are the two concrete abutments that once supported a steel railroad bridge, which has been removed. The road between the abutments is approximately 13 feet wide. *Id*., F.F. No. 16. Of the three roads, Ramsaytown Road is the only one that is paved. The other two are dirt roads. The three township roads narrow by approximately two to four feet as they enter the railroad underpass. *Id*., F.F. Nos. 15-16, 28-29, 34-35. *See also* Reproduced Record at 541a. (R.R. __).

The ALJ identified roadway design issues with all three railroad bridges. For example, two vehicles cannot travel at the same time through any of the three underpasses, which is inconsistent with modern road design. The abutments on Harriger Hollow Road are located in the so-called "clear zone,"[2] which is also inconsistent with modern design. There are no guide rails to prevent the motorist who leaves the road from hitting the abutments or the wing walls supporting the embankment. Because of the bend in Harriger Hollow Road, the abutments limit the sight distance. These design issues are not disputed, but they miss the mark.

---

[2] The clear zone is "the total roadside border area starting at the edge of the traveled way, available for safe use by errant vehicles." ALJ Proposed Adjudication at 28. This "area may consist of a shoulder, a recoverable slope, a non-recoverable slope, and/or a clear run-out area." *Id*. The concept of a "clear zone" applies to new construction. Notably, any object along a road, whether a tree, rock, or traffic sign, presents a risk, should the vehicle leave the road and hit the object.

First, in finding the railroad bridges unsafe because of their design, the ALJ relied on testimony that, in turn, relied upon the Pennsylvania Department of Transportation's (PennDOT) Design Manual. However, this Design Manual expressly provides that it applies only to new construction, not to existing railroad bridges erected in 1906. Even so, as the majority points out, PennDOT's Design Manual was not entered into the record.[3] The uncontroverted testimony of Railroad's expert, Charles A. Wooster, established that the Design Manual does not require the modification of existing roadways and bridges, even those that may be substandard. Wooster Prepared Direct Testimony at 6; R.R. 374a. *See also* Notes of Testimony, 1/25/2022, at 117-19; R.R. 142a-44a. The ALJ acknowledged that PennDOT's Design Manual serves as a guide only for new roadway construction or improvement projects. ALJ Proposed Adjudication at 28-29; R.R. 861a-62a. In short, substantial evidence does not support the ALJ's finding that the design of the railroad bridges renders them unsafe and in need of immediate demolition, notwithstanding their relatively safe use for over 100 years.[4]

Second, in finding design problems, the ALJ also noted the absence of warning signs and guide rails to prevent collisions by motorists with the overpasses. These installations are the responsibility of the owner of the road. *See* 42 Pa. C.S. §8542(b)(6) (authorizing tort claims against local governments for condition of their roads). Further, motorists have a responsibility to use roadways in the ordinary and usual manner and with reasonable care. *Felli v. Department of Transportation*, 666

---

[3] Although experts may rely upon information that is not admitted into evidence to develop their expert opinion, "an expert cannot base his [or her] opinion upon facts which are not warranted by the record." *Harley-Davidson Motor Company v. Springettsbury Township*, 124 A.3d 270, 286 (Pa. 2015) (quoting *Collins v. Hand*, 246 A.2d 398, 404 (Pa. 1968)).

[4] PennDOT accident data established 2 accidents in 10 years, both of which involved driving in snow at excessive speed. R.R. 373a-74a.

A.2d 775, 777 (Pa. Cmwlth. 1995). This includes taking care when approaching a point in the road that allows the passage of only one vehicle at a time or where sight distance is limited. Again, the need for signs and guardrails on the roadways does not justify demolition of the railroad bridges.

In sum, to the extent the ALJ found the bridges unsafe because of their design, this finding is not supported by substantial evidence. The ALJ capriciously disregarded Railroad's uncontroverted evidence of the low traffic volume[5] as well as its uncontroverted expert report that the railroad crossings can safely accommodate the expected traffic volume on each road. R.R. 379a-86a.

Likewise, the ALJ's findings on loose and flaking concrete did not demonstrate that all three bridges require demolition. The testimony of the Township supervisor that a worker removed a piece of concrete from Ramsaytown Road was hearsay and, even so, irrelevant to the other two roads. There was no testimony from a witness who actually saw concrete fall from the Ramsaytown Road railroad bridge or could attest that the concrete piece originated with the railroad bridge, as opposed to falling off a truck.

To be sure, the record did establish that the concrete supports for the railroad bridges show loose and flaking concrete on the walls and ceiling of the underpasses. However, there was no evidence, or finding, that this problem cannot be addressed by more diligent maintenance, resurfacing, or measures short of total destruction.

The PUC's adjudication casts a wide net. The design issues identified by the ALJ apply to an untold number of railroad overpasses in Pennsylvania, as

---

[5] Ramsaytown Road carries an average of 312 vehicles a day, East Bellport Road carries 30 a day and Harriger Hollow Road carries 15 a day. ALJ Proposed Adjudication, F.F. Nos. 102-04.

MHL-4

acknowledged by the PUC's engineer witness, William M. Sinick. R.R. 253a. This is concerning because of the precedential effect the PUC affords each adjudication.[6]

I would vacate the PUC's adjudication and remand the matter to the PUC to fashion an order to Railroad to abate the loose and flaking concrete surfaces of the otherwise structurally sound railroad overpasses. The existence of surface deterioration is the only factual finding of the ALJ supported by substantial evidence.

MARY HANNAH LEAVITT, President Judge Emerita

---

[6] The PUC relied upon its adjudication in *Mahoning Township v. Buffalo & Pittsburgh Railroad, Inc.* (Docket No. C-2017-2585787, filed August 2, 2018), which is factually and legally indistinguishable, to support its order in the instant case.

MHL-5